**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DAN M. BLAYLOCK,
4229 Lenore Lane, N.W.
Washington, DC 20008

Plaintiff,

     - against -

PETRA SMELTZER STARKE,
5619 Title Row Drive
Bradenton, FL 34210

and

JIRI NOVAK,
Address Unknown

              Defendants.

Case No.: 1:23-CV-3606-TNM

**PROPOSED FIRST AMENDED**
**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Dan M. Blaylock, for his complaint against defendants Petra Smeltzer Starke and Jiri Novak states as follows:

## NATURE OF THE ACTION

1. Plaintiff Dan Blaylock was forced to bring this action against Defendant Petra Smeltzer Starke and her co-conspirator, Jiri Novak, to stop their reprehensible campaign against him, consisting of lies, false accusations, and extortion for financial gain. Plaintiff Blaylock is the retired CEO of a successful company. Defendant Starke claims to be a former model, attorney, yoga instructor, and internet influencer. Blaylock met Starke in 2010, and began a non-exclusive romantic relationship with her in 2018. Starke said that her husband (former NFL player George Starke) knew about, and consented to, their relationship. Although both parties were well aware

that their relationship was not exclusive, Blaylock generously gave Starke money to buy a house, loaned her money, paid for her medical treatment and vacations, cared for her during her treatment for rectal cancer, mentored her young son, and allowed both Starke and her son to stay at his house in the District of Columbia.

2.      In June 2022, however, Blaylock cut all ties with Starke after she became enraged that he had not retained a plastic sex toy that she claimed was the cause of her rectal cancer, and that she hoped to use in a products liability lawsuit against its manufacturer.  Starke did not take well to Blaylock ending their relationship, and embarked on a vitriolic and unceasing multi-pronged attack against him that has included: (i) circulating a video interview of herself to Blaylock's family and friends, in which she falsely claims on camera that Blaylock sexually assaulted her; (ii) entreating Blaylock's family and friends by email to join her movement to "ban" Blaylock; (iii) revealing to Blaylock's family and friends private information about Blaylock's personal life, including texts and photographs, that Starke apparently stole from Blaylock's iPhone, iPad and computer; (iii) weaponizing her cancer against Blaylock by falsely claiming that he caused her rectal tumor and hair loss; (iv) threatening Blaylock and attempting (with the other defendants) to extort money from Blaylock for her own personal gain, including by falsely claiming that Blaylock promised to marry her, to provide her with a second house and $2 million for her son, and to employ her as his personal general counsel at a salary of $500,000 per year.

3.      Even though Starke and Blaylock exchanged thousands of emails, texts, and WhatsApp messages, Starke does not have a single piece of written evidence to corroborate any of her claims.  In fact, the record reveals quite the opposite.  Starke enthusiastically participated in a consensual sexual relationship with Blaylock for many years.  Before, and after, the times Starke claims Blaylock sexually assaulted her, Starke constantly sent Blaylock explicit and sexually

2

provocative communications, videos and photographs.  Starke also repeatedly begged Blaylock to spend time with her, and money on her.  In these thousands of communications, Starke never once mentioned sexual assault or any of Blaylock's alleged monetary promises to her.

4.  Unlike Starke, Blaylock is a private person who avoids social media and the public spotlight.  When Starke and the other defendants recently started publishing lies about Blaylock, Blaylock's counsel wrote to them demanding that they stop.  But their campaign continued, nonetheless.  Although it was difficult for Blaylock to bring this action against Starke, and to expose his private life to public scrutiny, Starke's untrue and escalating accusations, and ongoing attempts at extortion have left him no choice but to do so.  Starke's extortionate efforts to defame and destroy Blaylock must end once and for all.

## PARTIES

5.  Plaintiff Blaylock, an individual, is a citizen of the District of Columbia.

6.  Upon information and belief, Defendant Starke, an individual, is a citizen of Florida.

7.  Upon information and belief, Defendant Jiri Novak ("Novak"), an individual, is a citizen of the Czech Republic.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because it includes claims for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Stored Communications Act, 18 U.S.C. § 2701, et seq.

9.  This Court also has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction) because this is a civil action where the matter in controversy exceeds $75,000 and is between citizens of different States.

10.    This Court has supplemental jurisdiction over the State law claims alleged in this Action pursuant to 28 U.S.C. § 1367(a) as those claims form part of the same case or controversy alleged herein.

11.    This Court also has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Court's inherent equitable powers.

12.    There is personal jurisdiction over Defendant Starke pursuant to the District of Columbia Long-Arm Statute, § 13-423, because the claims alleged herein arise from Defendant Starke's: (i) claims of allegedly transacting business in the District of Columbia; (ii) claims of allegedly contracting to supply services in the District of Columbia; (iii) causing tortious injury in the District of Columbia by an act or acts in the District of Columbia; and (iv) causing tortious injury in the District of Columbia by an act or acts outside the District of Columbia and, upon information and belief, regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods used or consumed, and services rendered, in the District of Columbia. Further, Defendant Starke has already appeared and litigated this action without raising personal jurisdiction objections, and any such defense is therefore waived under Federal Rule of Civil Procedure 12(h)(1).

13.    There is personal jurisdiction over Defendant Novak pursuant to the District of Columbia Long-Arm Statute, § 13-423, because at a minimum the claims alleged herein arise from Defendant Novak's causing tortious injury in the District of Columbia by an act or acts in the District of Columbia. As set forth below, on information and belief, Defendant Novak knowingly joined and furthered a conspiracy with Defendant Starke to create, maintain, and disseminate a defamatory website targeting Plaintiff, a District of Columbia resident, with the intent and reasonable expectation that the brunt of the injury would be felt in the District. By acting in concert to publish and prolong the publication of false and harmful statements about a D.C. resident, Defendant purposefully directed his conduct at the District, thereby subjecting

4

himself to specific jurisdiction under the D.C. long-arm statute, including § 13-423(a)(1) (transacting business in the District), § 13-423(a)(3)–(4) (causing tortious injury in the District by an act outside the District with the intent to injure and with foreseeable consequences in the District), and under the conspiracy theory of jurisdiction recognized by courts in this District. Defendant Novak's intentional participation in a tort aimed at the District likewise satisfies due process, as he purposefully availed himself of the forum by engaging in conduct expressly calculated to cause harm here, and the claims arise directly from those contacts.

14.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) as this is a judicial district in which a substantial part of the events giving rise to the claims alleged herein occurred.

## FACTUAL BACKGROUND

**A.    Blaylock's and Starke's Romantic Relationship**

15.    Blaylock, a widower, first met Defendant Starke at a yoga class in the District of Columbia, in or around 2010.  At that time, Starke was residing in the District of Columbia.  Starke, at that time going by the name Petra Smeltzer, told Blaylock that she was not married.

16.    Blaylock and Starke reconnected in the District of Columbia in the late spring or early summer of 2018.  At that time, Starke informed Blaylock that she had gotten married to a former NFL football player named George Starke.  She also informed Blaylock that she had a young son named George Starke IV, who she calls "LG" or "Little George."

17.    At that time, Starke also said that her husband, George Starke, knew about, and consented to, their relationship.  Starke claimed that George Starke suffered from chronic traumatic encephalopathy, or CTE, caused by repetitive head injuries he had gotten during his professional football career.  She said that George Starke had run through all of his money and had become an alcoholic and a deadweight that she had to support, along with their son.  She claimed that she and George Starke slept in separate bedrooms and no longer had a romantic or sexual relationship, but

stayed together for the sake of their son. She said that Blaylock was the "lynchpin," who provided her "escape" from her marriage with George Starke. Starke claimed that if she had "one day to live," she would "say goodbye" to her son and spend it with Blaylock.

18. Over the next four years, until June 2022, the parties saw each other about once a month, and regularly texted, emailed and communicated over WhatsApp. Starke (and her son) often stayed at Blaylock's house in the District of Columbia, sometimes even when Blaylock was not present.

19. Throughout the parties' romantic relationship, Blaylock made it clear that he was not in a monogamous relationship with Starke, and that he did not want to marry her. Starke understood and accepted that. As Starke put it, "I love [George] and even you. Both you & [George] fulfill different needs and spaces in my life. I am not looking to 'divorce [George] to be replaced by Dan.'"

**B.    Starke's Precarious Financial Situation and Her Failed Attempt to Get Money from Billionaire Kenny Hill**

20.    Starke holds herself out as a Czech immigrant who came to the United States, got a law degree, worked in the Obama Administration, and then became the President and CEO of Bikram Yoga College. When Starke and Blaylock reconnected in 2018, however, Starke's personal financial situation was precarious. She had lost her job with Bikram Yoga College when, under her watch, Bikram Choudhury, the founder of the company, was exposed as a serial sexual predator and the company fell apart. Starke claimed to Blaylock that she had gotten a $5 million judgment against Bikram, but that he had fled the country and that the judgment was essentially unenforceable.

21.    Starke was attempting to get her own yoga business, SweatNGlow, off the ground, and was also trying to make money as an Internet influencer.

6

22.    Starke also sought to support herself through other means.  According to Starke, she had a longstanding friendship with the billionaire Kenny Hill, who was from the Six Nations in Canada, and perhaps the wealthiest indigenous businessperson in that country.  In 2019, Hill was looking to separate from his wife, Cat.  Starke first sought Blaylock's advice on negotiating a deal where Hill would pay Starke $100,000 for representing Cat in the custody dispute (Starke claimed that she had already performed those legal services for Cat), for serving as a trustee for Hill's children, for acting as a consultant to set up two SweatNGlow locations in Canada (for $15,000 per month) and for serving as the business and legal manager of Hill's businesses on the West Coast.

23.    Upon information and belief, that deal did not materialize.  Starke then sought Blaylock's advice on negotiating a deal with Hill where Starke would take care of Hill's children, and in return Hill would buy her a house in Florida, pay for her son's private school tuition and tennis expenses, and pay Starke $6,000 a month, among other things.

24.    In September 2020, Starke helped Hill physically remove his children from their mother's custody, and signed a declaration attesting to Cat's unfitness as a mother.  Starke moved to Florida with her husband, son, and Hill's children.  By October 2020, that arrangement had fallen apart, and Starke was complaining to Hill's lawyers that Hill had made monetary promises to her that he was not fulfilling, and demanding payment of more than $1 million.  In an email to those lawyers, she threatened that if it came to litigation, she would reveal certain facts about Hill and his relationships with his girlfriend and his ex-wife.

25.    Then in November 2020, in a startlingly candid email to Blaylock, Starke laid out how she planned to manipulate Hill to get the money that she wanted from him.  Starke stated that "in yoga today I realized that if everything failed, the cheapest way to resolve the situation might

be appealing to Kenny's ego and desire/lust for me.  I could send him a message with my bill, tell him I am on the transition which is unpaid but monetizable once Biden's administration is in power, I may even get a job in the Administration which will be valuable to him, appease his ego by telling him how he opened my eyes with respect to [George] and empowered me to make changes but that I cannot make changes unless he pays me in full . . . . I would not do this without really talking it through with you and thinking it very carefully through.  But if I were to do that, after he paid me, I would block him & cut him off completely."

26.    In January 2021, Hill died suddenly.  Upon information and belief, Starke did not obtain significant compensation from Hill before his death, or from his estate.

**C.    Starke Manipulates Blaylock Into Advancing Over $1,000,000 to Her, and Reneges on Her Promises of Repayment**

27.    Starke lives an expensive lifestyle.  As is evident from her social media posts, Starke enjoys nice homes, travel and expensive hotels.  Her young son attends a private tennis training academy.  Starke spends freely on herself for, among other things, Tracy Anderson fitness classes, hair extensions, expensive clothes, Louis Vuitton dog carriers and other items.

28.    Upon information and belief, after Hill died, Starke's ability to keep herself and her family in the style to which they were accustomed was in jeopardy.  In November 2020, Starke told Blaylock that she had rectal cancer, and was facing expensive cancer treatments with no health insurance, and no steady source of income to support her family.

29.    Between August 2019 and April 2022, Starke manipulated Blaylock into making payments to Starke or to others on her behalf, totaling more than $1 million.  Those payments included:

   a.    $700,000 for her to buy a home in Bradenton, Florida after Starke told Blaylock that she was facing eviction and would have nowhere to live

8

during her cancer treatment;

b.      $175,000 for her medical expenses, including travel to clinics and treatment centers, surgery, chemotherapy and radiation, hospital bills, hypobaric chamber treatments and health insurance;

c.      $60,000 to avoid foreclosure on Starke's house in Beverly Hills (she had missed nine mortgage payments);

d.      $50,000 for her son's private school tuition; and

e.      $50,000 for her to retain an attorney, Keith Berglund, to seek to enforce her judgment against Bikram Choudhury.

30.     In April 2022, Starke represented to Blaylock that she was going to Madrid on business, and asked Blaylock to travel with her, and advance their travel costs, which she said would be reimbursed.  Blaylock footed the bill for the trip, which included first class air travel and a stay at the Four Seasons, and he provided Starke with an invoice for the trip for almost $40,000, but Starke never reimbursed him for any of it.

31.     Blaylock also gave his Rolex watch (valued at approximately $25,000) to Starke based on her promise to have it repaired for him; Starke never returned it.

**D.      Starke Begins Falsely Accusing and Threatening Blaylock**

32.     Despite Blaylock's generosity, Starke was apparently not satisfied with the status of the romantic and financial relationship between the parties.  In June 2022, Starke began a campaign of threatening Blaylock, upon information and belief in an attempt to extort additional money from him.

33.     In 2020, Starke and Blaylock decided to experiment with anal sex.  Blaylock purchased an inert plastic anal plug that he and Starke used briefly on one occasion.

9

34.     In late 2020, Starke was diagnosed with rectal cancer.  In writing, she alternately blamed Kenny Hill and Bikram Choudhury for causing her health problems and cancer.  For example:

a.  In an email to Blaylock dated on or about October 12, 2020, Starke told Blaylock that she was seeking over a million dollars from Kenny Hill, which included compensation for her "medical expenses" and "emotional distress manifested by my health issues," because "prior to this time, I have NEVER had ANY abnormal tests . . . [s]o in my mind these are perfectly justifiable as emotional distress are [sic] proper damages . . . ."

b.  In an email to Blaylock dated December 24, 2020, Starke provided Blaylock with the text of an email she intended to send to Robbin Itkin, the trustee of the Bikram bankruptcy, as part of Starke's ongoing efforts to get money from the bankruptcy estate.  In that email, Starke wrote that "my healthy lifestyle combined with lack of any genetic foundation for cancer in my family suggest that the only reason for my cancer is the stress and toxic environment caused by Bikram, my litigation and this protracted nightmare of bankruptcy."

35.     Blaylock supported Starke financially and emotionally during her cancer treatment. Among other things, Blaylock financed and accompanied Starke on trips to Johns Hopkins, the Cleveland Clinic and UCLA Medical Center to explore treatment options.  Starke had two surgeries at Johns Hopkins, and after each instance, Blaylock had Starke stay with him in his home in the District of Columbia to recuperate, and Blaylock cared for her, including emptying her colostomy bag, preparing meals and administering medication.  This was especially emotionally difficult for Blaylock, because he had previously cared for his wife and witnessed her lose her

battle with cancer.

36.     Blaylock also paid for Starke's first class airfare to and from Baltimore during her treatment, and allowed her (and her son) to stay at his home in the District of Columbia.

37.     In March 2021, nearly a year after what Starke called the "butt plug accident," out of nowhere Starke asked Blaylock for the receipt from the anal plug, because she wanted to sue the manufacturer for causing her rectal cancer.  Starke first stated in a text that she needed to pay her son's private school tuition.  Then, later that day, she texted:

> petra smeltzer
>
> Dan - I need your receipt from the butt plug. Nobody should suffer as much as I have been. The pains are worse than giving birth. Baily & Glassman is ready to go. You can ask Bruce. They are top PI shop in the US. I need to be secure. I don't want to worry about tuition & living situation. That only ads to my spasms and pain.I don't want to chase Lybians & Roger & other shady ppl to make money. That manufacturer needs to pay for what it did I to me. Please support me. You heart Efron. I will loose my rectum and entire body part. That is prob worth $7–12M. If they send a strong demand letter and they can use only initials, I should be able to get $1M at least. There is imperial evidence. Other ppl got cancer. Pls support me in this. Nobody deserves what happened to me. Thank you 🙏

38.     Blaylock did not hear anything more about the subject of the anal plug, until June 2022, more than a year from Starke's text regarding suing the manufacturers, and two years from the time that they experimented with the device.

39.     On or about June 15, 2022, Starke sent the following text, threatening Blaylock and accusing him of using "that butt plug on more than me," and making "countless assurances."  She asked Blaylock to "look again for the butt plug" as it was "important to my products liability lawsuit."

> Dan my attorneys are deeply disturbed that you told me yesterday you "threw away the butt plug after I got hurt." This is obviously a key piece of evidence. I must admit your shrieking at me was agonizing and made my stomach a mess FYI. You continue to hurt me and turn a victim into a criminal. What I am even more disappointed is I told you by text message in December 2020 while I was in Aspen and you in Miami with the horse that I was talking to Mike Murphy and that I would be filing this lawsuit. You simply blew me off. I mistakenly trusted you. You used that butt plug on more than me. I had a right to know. You made countless assurances. I am not even sure I believe you magically and conveniently threw out the butt plug. You told me you were faithful you were not. You shrieked at me and my stomach exploded and continues to. Please look again for the butt plug. It is important to my products liability lawsuit. I am so disappointed you called me to scream and abuse me and make someone recovering from Stage 4 Cancer cry and live on the toilet. You had no right to deceive me and use a butt plug on me that you used elsewhere. I am not gonna get into my vaginal wall but you have broken me into pieces and all you do is scream at me. Please look again for the butt plug. So disappointed I put my belief and faith and body in the wrong hands, your hands.

40.     Blaylock was alarmed by Starke's sudden and entirely baseless accusations. Contrary to Starke's statements, however, Blaylock did not scream or shriek at Starke. While Blaylock had disposed of the anal plug months before (since he had no reason to keep it), he did not say that he threw it away "after [Starke] got hurt." Blaylock never represented to Starke that they had a monogamous relationship. Blaylock never told Starke that he was "faithful." Blaylock also never used the anal plug with anyone other than Starke.

41.     Because of Starke's false accusations, lies and threats, Blaylock decided to cut off all ties with Starke. On or about June 18, 2022, Blaylock provided Starke with a written response to her text in which he made it clear that her text contained "profound misrepresentations

completely mischaracterizing" events he was present for.  A true and correct copy of that letter is attached hereto as Exhibit A.

**E.     Starke Threatens Blaylock Again, and States that She Has Back Up Files of His Personal and Business Records**

42.     Starke reacted poorly to Blaylock ending his relationship with her and escalated her threats and accusations.

43.     On or about October 26, 2022, Bruce Blaylock, Plaintiff Blaylock's brother, received a letter from Starke (holding herself out to be a Florida lawyer), a true and correct copy of which is attached hereto as Exhibit B (the "October 2022 Letter").  In the October 2022 Letter, Starke did not articulate any legal claim she had against Blaylock, but she instructed Blaylock to preserve evidence.

44.     Starke also faxed the October 2022 Letter to the front desk of the Hotel Bel-Air in Los Angeles, California, apparently in an effort to embarrass Blaylock.

45.     Starke again threatened Blaylock, stating in the October 2022 Letter that her "team" had "back up files" on Blaylock's "personal and business life," and naming banks and entities related to Blaylock's investments.

**F.     Starke Falsely Claims that She is Entitled to Millions of Additional Dollars from Blaylock**

46.     On or about November 23, 2022, Venable LLP ("Venable," Blaylock's attorneys in this Action) responded to the October 2022 Letter (the "Venable November 2022 Letter").  A true and correct copy of the Venable November 2022 Letter is attached hereto as Exhibit C.

47.     As requested by Starke in the October 2022 Letter, Venable addressed the November 2022 Letter to Louis I. Lang, Esq., whom Starke had said was representing her in the matter.  Among other things, Venable requested the legal basis for Starke's demands.

13

48.    On or about December 12, 2022, Lang stated that Starke's demands were based on the following alleged promises Blaylock had made to Starke:

a.    Lang stated that Blaylock had promised to marry Starke.

b.    Lang stated that Blaylock had promised to buy Starke not only the house that he purchased for her in Bradenton, Florida, but also a second apartment in Miami, Florida that cost another $750,000.

c.    Lang stated that Blaylock had promised to gift Starke's son $2,000,000.

d.    Lang stated that Blaylock had promised to pay off the mortgage on Starke's home in Beverly Hills, California in full, as opposed to making a payment to prevent foreclosure.

e.    Lang stated that Blaylock promised to pay Starke $500,000 per year to be his personal general counsel, and he owed her $2,000,000 for four years of past services.

f.    Lang stated that Blaylock had promised to be 50/50 partners with Starke in a real estate investment entity called Middleton Partners.

49.    Lang stated that he had nothing in writing to memorialize or to corroborate any of the alleged promises set forth in paragraph 48 above.

50.    Blaylock did not make any of the alleged promises set forth in paragraph 48 above.

51.    None of the alleged promises set forth in paragraph 48 above are legally enforceable.

52.    Among other things, Blaylock could not have married Starke, even if he had wanted to (which he did not), because upon information and belief, Starke is still married to George Starke. Starke and George Starke continue to tag each other regularly on social media, and as recently as

14

October 31, 2023, Starke posted a photo of her and George Starke in their Halloween costumes:



53.    Moreover, promises to marry are not legally enforceable in this jurisdiction.

54.    Starke also did not perform any legal or business services for Blaylock, as Blaylock's personal general counsel, or otherwise.  In fact, it was quite the opposite: Starke constantly emailed Blaylock to ask for his opinion and advice on her own ventures and on legal work she was doing for others.  These matters, where Starke looked to Blaylock for guidance and advice, included:

a.  making a recommendation on a highly confidential transaction for Starke's client Peter Shamoun/ARFSCO, stating to Blaylock: "I have to review this transaction for Pete & make my recommendations.  Would you mind helping me with this, as this

is my first task of this nature for Pete, so I am a little nervous?  You review deals all the time.  I used to, so would love you[r] input;"

b.   advising ARFSCO on a potential issue involving OZ Dairy;

c.   financing the acquisition of the intellectual property of Bikram Yoga College;

d.   negotiations with the attorneys for Kenny Hill;

e.   signing a declaration regarding Cat Hill's unfitness as a mother;

f.   outside funding for SweatNGlow and making presentations to potential investors;

g.   a transaction with Fitness International, owner of LA Fitness;

h.   reviewing financial projections for SweatNGlow;

i.   pursuing Bikram Choudhury's assets and retaining Keith Berglund as legal counsel;

j.   representation of Steve Pigeon, legal consultant for NXIVM;

k.   formation of a venture called Indian Magic LLC to sell pain relief products; and

l.   fighting Starke's eviction from a rental property in Bradenton, Florida.

**G.   Starke Defamed Blaylock By Alleging That He Sexual Abused Her**

55.   In or about September 2022, Starke told others that Blaylock had committed forcible anal penetration against Starke at Blaylock's home in this District.  Starke alleged that she "refused" Blaylock's repeated requests to "try anal" and "to use a butt plug he had allegedly purchased" and "finally [he] just did it to her after she said NO!"

56.   Starke also told others that she had "cut off contact with [Blaylock] throughout 2022."

57.   Starke's false accusations against Blaylock were clearly part of her overall plan to harass Blaylock and to extort money from him.

58.   For example, Starke had no explanation as to why she waited two and a half years

16

to report, in September 2022, a sexual assault that had allegedly occurred in March 2020.

59.    Moreover, after the alleged March 2020 incident, Starke did not cut off contact with Blaylock, as she had told others.  Instead, Starke sent Blaylock more than 1,000 text messages, nearly 400 WhatsApp messages, and more than 350 emails over the next two years.  Rather than suggesting in any of those communications that Blaylock had harmed her, Starke instead repeatedly sent Blaylock sexual messages and invitations, and explicit photos of herself.  For example, Starke's communications demonstrate that:

a.    On or about April 6, 2020, within a few weeks of when Starke claims she was sexually assaulted by Blaylock, Starke sent Blaylock a sexually explicit and totally nude photo of herself over WhatsApp.

b.    On or about April 22, 2020, Starke sent Blaylock a video over WhatsApp of Starke in a clingy dress, writing "I think this video away from sun shows you how the dress hugs my body better. I am thinking no underwear for sure!"

c.    On or about April 20, 2021, Starke emailed Blaylock that she had "never tried anything more comfortable on my body other than your touch, lips and…, [sic] of course."

d.    On or about June 13, 2021, Starke emailed Blaylock that she was "thinking about you constantly and sending you the best, most positive, sweetest vibes. I love you so much DB that you cannot even comprehend how much!!! I know it is a mystery to you but it is my reality, so enjoy it. You have been my rock through this ordeal. I cannot thank you enough and even more important cannot wait to see you!!! P:) xoxox"

e.    On or about September 3, 2021, Starke emailed Blaylock that she had "been having

17

dreams about you every single night this week."

f. On or about February 14, 2022, Starke emailed Blaylock that she was "dreaming about you on this Valentines day [sic]. Last year & a couple of years before then, we were together. It is cold & windy here too. I am counting the days until I get to snuggle you."

60. Starke also initiated numerous vacations and other opportunities for in-person sexual contact with Blaylock after the alleged March 2020 incident, including:

a. In June 2021, Starke and Blaylock met in Las Vegas, Nevada, where they received couples' massages, shared a hotel room, and continued their sexual relationship.

b. In November 2021, Starke and Blaylock met in Baltimore, Maryland where the two shared a hotel room and continued their sexual relationship.

c. As alleged in paragraph 30 above, in April 2022, Starke convinced Blaylock to take her to Madrid, Spain (at Blaylock's expense) for a business meeting and that all of her travel expenses would be reimbursed.   Starke asked to book a couples' massage, shared a hotel room, and engaged in sexual activities with Blaylock while there.

61. In addition, rather than cutting Blaylock out of her life after the alleged incident, in or about April 2021, Starke instead executed a Will where she named Blaylock as the Trustee and Guardian of her minor child, George Starke IV.

**H.    Starke and her Co-Conspirators Defame and Attempt to Extort Blaylock**

62. On or about November 13, 2023, Blaylock discovered an email in his spam folder purporting to be from Keith Berglund, the attorney Blaylock had paid to pursue Starke's judgment against Bikram Choudhury.   The email from Berglund, dated October 26, 2023, stated that

Blaylock should "see the below email from my Client Petra Smeltzer Starke," and forwarded a message from Starke to Berglund.  A true and correct copy of the October 26, 2023 email from Keith Berglund (redacted to remove all email addresses and the link described in Paragraph 62) is attached hereto as Exhibit D.

63.     In the forwarded message, Starke stated that she was working on a "documentary" being "directed and produced by the former Chicago Tribune's investigative reporter & documentarian Alfredo De Villa."  She included a link to "footage" of her being interviewed which she stated "we are preparing to expand and begin to distribute both in America and outside of the United States. In conjunction with our anticipated and planned release of the documentary, we are in talks with both USA Today, Reuters, and, of course, Rolling Stone magazine as well as Amazon and Netflix to cross promote both my story as well as the documentary."  Starke also stated that "[w]atching the footage below is not for the faint of heart nor is it for those people who do not believe women who have been raped."  Finally, Starke stated that interviews for the "documentary" had to occur "no later than December 1st as we'll be turning in all the footage to the editors, the distribution company, and of course the media for them to review."

64.     The link in Starke's email leads directly to a 24-minute video hosted on Vimeo (the "Starke Video Interview").  The Starke Video Interview is not a documentary.  Most of the Starke Video Interview consists of low production quality clips of Starke sitting against a black background and answering questions posed to her by an off-camera interviewer.  In some instances, her words are punctuated by still images that appear on the screen.

65.     In the Starke Video Interview, Starke makes false and disparaging statements about Blaylock, including the following:

   a.  Blaylock "sodomized" her without her consent on two occasions, once with his

penis and once with the "butt plug."  In one of the occurrences, in July 2020, Blaylock physically injured her rectum.

b.  Blaylock raped her on two occasions, once in his Miami condo (a superimposed title in the Starke Interview Video calls this the "Miami Rape") and once at the Bel-Air Hotel in Los Angeles, California (a superimposed title in the Starke Interview Video calls this the "Hotel Bel-Air Rape").

c.  Blaylock had unwanted sexual intercourse with her during her cancer treatment when she was in a weakened physical state.

d.  Blaylock brainwashed her.

e.  During the time when Blaylock "sodomized" her, he had sex with two men.

f.  Blaylock's "sodomy" on two occasions caused her cancerous rectal tumor.

g.  Blaylock "screamed" at her for "two hours" when she told him that her doctor said her cancer was attributable to him.

h.  Blaylock's behavior and the way he treated her caused her hair loss, which "crushed" Starke because she is a woman and former model.

66.    Each and every one of these claims is entirely false.

67.    At one point, the Starke Video Interview cuts to an interview with a man Starke describes as a Polish distributor, who upon information and belief is named "Jorie."  "Jorie" says that one day at lunch, Starke told him that she had just come from the Bel-Air hotel where she was raped by "Dan," a potential investor in her film.

68.    The Starke Video Interview also includes off-screen voices from at least two men. When "Jorie" makes his statement that Starke told him she was raped, one of the off-screen men, named "Steve" can be heard saying "Great."  The other off-screen man, who speaks with an accent,

20

tells "Steve" to "let him finish.

69.    The Starke Video Interview also contains Blaylock's personal and private information, some of which, upon information and belief, Starke stole from Blaylock's electronic devices, including Blaylock's iPhone SE second generation, iPhone SE third generation, and iPad Pro (the "Apple Devices"), Blaylock's Microsoft Surface tablet (the "Surface Tablet"), and/or Blaylock's Dell OptiPlex Desktop Computer (the "Computer") (collectively, the "Electronic Devices").  This information includes three full frontal nude images of Blaylock, and private, intimate photos and texts Blaylock exchanged with people other than Starke over the years.

70.    In the Starke Video Interview, Starke also admits to having gained access to, and read, Blaylock's private text messages to people other than her.  For example, Starke states that she "saw text messages" where Blaylock was arranging a sexual encounter with someone.

71.    On or about November 18, 2023, Blaylock received an email from "Evgeny Bolotin" that was simultaneously sent to Blaylock's brother, his brother's ex-wife, his 91-year-old mother and his 93-year-old father.  That email also contained a link to the Starke Video Interview. The email stated that "[w]e fully expect a release at the Berlin Film Festival in February and a full screening at the Cannes Film Festival in May.  Furthermore, we will be doing announcements at the Sundance Film Festival in America in January."  The email stated that they had been "extremely pleased with the reaction we have had from major distributors."  The email included "a selection of images that many of the audience members have found quite compelling and some are included in the documentary for your review."  The images included:

      a.  Blaylock's private texts that, upon information and belief, Starke had stolen from Blaylock's Electronic Devices after accessing his texts, photos and videos without his consent;

21

b.  private photos and texts Blaylock exchanged with women over the years; and

c.  photos of Blaylock's prescription medication bottles (containing private medical information) and legal, recreational drugs.

72.  On or about November 20, 2023, Venable partner William J. Briggs sent a letter to "Evgeny Bolotin" and Keith Berglund, putting them on notice of the false and defamatory material contained in the Starke Video Interview and the emails they had been sending, and demanding that they cease and desist from further dissemination of that material.  A true and correct copy of that letter (redacted to remove all email addresses) is attached hereto as Exhibit E.

73.  Undeterred, on or about November 22, 2023, "Evgeny Bolotin" again sent an email to Blaylock, his brother, his brother's ex-wife, his 91-year-old mother and his 93-year-old father, claiming that he and Starke were "aligning with the #metoo movement" by launching #bandan, (in other words, a hashtag calling for a "ban" on Blaylock), that they were offering free #bandan t-shirts, and that after Christmas they would be offering:

#METOO



#BANDAN

A true and correct copy of this email (redacted to remove all email addresses) is attached hereto as Exhibit F.

74.  All of Starke's allegations in the Starke Video Interview and the emails sent by Starke and "Evgeny Bolotin" are demonstrably false.

75.  For example, Starke alleges that Blaylock forced her to have sex with him while she was undergoing chemo.  But the parties' communications tell a very different story:

a.  Starke, not Blaylock, brought up the idea of resuming sexual intercourse after her

22

cancer treatment, stating that she would "definitely ask the doctors what the timeline is for our sex life."  On or about June 21, 2021, Starke sent Blaylock the following communications, accompanying a suggestive photo of herself:

b.  A few days later, on or about June 26, 2021, Starke sent the following, stating that she could not "wait to make love to you again like we used to – for hours in every conceivable position and then some."

c.  On or about January 27, 2022, towards the tail-end of her cancer treatment, Starke texted Blaylock a topless photo of herself.

d.  On or about January 28, 2022, the parties had the following exchange:

23



    e.   Then, two weeks later, on or about February 14, 2022, Blaylock texted Starke, asking "Are you feeling sexual yet or still too early?" to which she replied:



    f.   On or about February 17, 2022, Blaylock and Starke had the following exchange:

24



g.  Later that day, Starke sent Blaylock a video of her bathrobe falling off, exposing her fully naked body.  She made the following comment:



h.  A few weeks later, Blaylock sent Starke a nude photo of himself, and the parties had the following exchange:

25



76.     Starke also alleges in the Starke Video Interview that Blaylock raped her in his condo in Miami.  This claim is completely contradicted by the parties' communications at that time.

77.     Starke visited Blaylock at his Miami condo from on or about April 1 to April 5, 2022.  On or about March 31, 2022, Starke sent the following:



78.     In the Starke Video Interview, Starke alleges that that the "Miami Rape" occurred right before she left for the airport.  She says that she was crying, hysterical and trying to fight Blaylock.  She says that Blaylock meticulously planned it to the minute, so that as soon as it was over, she had to leave for the airport.  She says that is why she did not go to the police.  Yet, Starke texted Blaylock the following, from the airport, on her way out of town:



79.    The photograph of Starke in the red bathing suit was taken, by her, in the very Miami condo where she now claims the rape occurred.  Starke said:



80.    The next morning, less than 24 hours after the alleged rape, Starke sent another photo, this one fully naked, again taken by her in the Miami condo where she says she was raped:



81.     Blaylock responded:



82.     Finally, a few days later, on or about April 9, 2022, Starke sent the following:



83.     In sum, far from going to the police to report a rape, in the following days Starke instead sent nude photos of herself to Blaylock, photos that she took of herself in the very condo where she says she was raped.  Rather than stating that their sexual encounter was forced, she instead refers to the parties' "first beautiful comeback weekend," stating to Blaylock that he had "made me so happy that weekend and we had the best time.  I would stay with you anywhere and go anywhere.  You are such a special guy.  I [love] U Dan."

84.     Starke's communications with Blaylock surrounding the alleged rape at the Bel-Air Hotel similarly contradict the story she tells in the Starke Video Interview.  Starke and Blaylock stayed at the Bel-Air Hotel in Los Angeles from on or about May 23, 2022 to May 29, 2022.  Starke had begged Blaylock to come to Los Angeles and take her to a Steely Dan concert.

28



85.    Both parties, according to this WhatsApp communication on or about May 16, 2022, were looking forward to the trip:



86.    Blaylock and Starke booked lunches and spa treatments and enjoyed the pool during their stay, as reflected in excerpts from the parties' texts:

29



87.    Finally, soon after the parties left Los Angeles, Starke sent the following:

Jun 7, 2022 at 2:13 PM



> **petra smeltzer**
> I am glad you got your phone back. You guys look great. 🥰 Say Hi to Mom & Dad. Are we spending this weekend together?    2:17 PM
>
> 7:45 PM
>
> **petra smeltzer**
> LA is not the same w/o YOU! ⍰    7:45 PM

## I. Blaylock is Forced to Bring this Action

88.     The Defendants' escalating series of false accusations and extortion attempts, culminating in spreading vicious lies to Blaylock's family and friends, left Blaylock with no choice but to bring this action against Starke and the other Defendants.  Because of Blaylock's refusal to give in to her extortionate demands, Starke has inflicted serious emotional harm on Blaylock, and has caused him to suffer significant monetary damages.  Blaylock brought this Action to force Starke and her co-conspirators to end the ceaseless campaign against him, retract the false statements they have made, and leave him alone forever.

89.      Upon information and belief, in or around December 2023, Starke and Novak conspired to create a website that leveled false and defamatory claims against Dan Blaylock, a successful entrepreneur who resides in Washington, D.C., and that published Blaylock's personal information without his consent (the "Website")[1]. Among the material illicitly displayed on the

---

[1] Because the Website is still active, Plaintiff has omitted the URL from this public filing in order to prevent driving additional traffic to the Website.

site are pictures of Blaylock unclothed, photographs of his prescription medications, and intimate images of his alleged romantic partners.

90.    Novak is a known associate of Starke and has a longstanding relationship with her. Among other things, Novak was seen in Starke's company as recently as August 2025, in Cabo San Lucas, Mexico, and as long ago as March 2019, when she visited Prague, Czechia:



91.    As recently as February 2025, Defendant Starke, through counsel, represented to the Court that Defendant Novak serves as her "social media director."

92.    Upon information and belief, Defendant Novak's business website operates through the url https://www.zapatizon.com/homepage.html. That website shows that, upon information and belief, Defendant Novak worked on the design of Starke's personal website:



93.     Defendant Starke's personal website contains nearly identical formatting, font styles, and layouts as the Website.

94.     In December 2023, the Website began using services furnished by Cloudflare, a company that offers domain name system (DNS) management solutions. In response to a third-party subpoena, Plaintiff learned that the user associated with the Website has the email address jiri.no@gmail.com.

95.     Upon information and belief, the email address jiri.no@gmail.com is used by, owned by, and/or associated with Defendant Novak.

96.     Among other things:

a.     During his romantic relationship with Defendant Starke, Plaintiff received emails from Defendant Starke that forwarded emails from a person she identified as "Jiri," at the email address jiri.no@gmail.com.

33

b. The email address associated with the registrant of the site zapatizon.com, a site operated by Defendant Novak, is jiri.no@outlook.com, a similar format to jiri.no@gmail.com.

c. An individual with the display name "nowakJ" indicated that jiri.no@gmail.com was his email address in a July 2011 comment on the Czech-language site zive.cz. In Czech a "w" is pronounced in the same manner as an English "v."

d. An open-source intelligence (OSINT) resource named Epieos.com, which searches publicly available information to identify accounts linked to a particular email address, identified jiri.no@gmail.com as being associated with the Google Maps account of an individual who upon information and belief, based on his picture and online reviews, is the Defendant Novak associated with Starke.

e. A Facebook page that upon information and belief belongs to the Defendant Novak, https://www.facebook.com/jirino.work, lists its contact email as jiri.no@gmail.com.

<u>COUNT I</u>
**Defamation**
**(Against All Defendants)**

97.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

98.    Starke, individually and acting as or through "Evgeny Bolotin," Keith Berglund, Novak, and upon information and belief, others acting at the direction of Starke and/or on her behalf, have made statements about Blaylock, including but not limited to the following:

a. Blaylock "sodomized" Starke without her consent on two occasions, once with his penis and once with a "butt plug."  In one of the occurrences, in July 2020, Blaylock physically injured Starke's rectum.

34

    b.   Blaylock raped Starke on two occasions, once in his Miami condo, and once at the Bel-Air Hotel in Los Angeles, California.

    c.   Blaylock had unwanted sexual intercourse with Starke during her cancer treatment when she was in a weakened physical state.

    d.   Blaylock brainwashed Starke.

    e.   Blaylock purposely destroyed the "butt plug."

    f.   Blaylock's "sodomy" on two occasions caused Starke's cancerous rectal tumor.

    g.   Blaylock's behavior and the way he treated Starke caused her hair loss, which "crushed" Starke because she is a woman and former model.

99.    These statements are entirely false and were made with knowledge that they were false, or alternatively negligently and/or with reckless disregard for their truth or falsity.

100.    These statements make Blaylock appear odious and tend to injure him in his trade, profession, and community standing, and lower him in the estimation of the community.

101.    The statements falsely claiming that Blaylock committed criminal offenses, including sodomy and rape, are libelous *per se*.

102.    These statements were published without privilege to third parties, including Blaylock's family and friends.

103.    Defendants also have published defamatory statements without privilege to third parties through the Website, including but not limited to the following:

    a.   Referring to Blaylock as a "narcissist" and a "exhibitionist" with a "sexual kink."

    b.   Sarcastically stating that Blaylock has a "very 'normal' lifestyle" and referencing usage of mushrooms, opiates, pills, Viagra, and marijuana.

    c.   Referring to Blaylock's "lovers" as including "men, women (teen, milf,

grandmothers), transvestite, etc."

    d.   Referring to Blaylock as a "predator."

    e.   Implying that Blaylock has sexually-transmitted infections, including HPV, HIV, and herpes.

104.    These statements proximately caused Blaylock actual injury, including but not limited to actual harm to his reputation, humiliation and emotional distress.

**COUNT II**
**Invasion of Privacy: False Light**
**(Against All Defendants)**

105.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

106.    Upon information and belief, Starke, individually and acting as or through "Evgeny Bolotin," and upon information and belief, others acting at the direction of Starke and/or on her behalf, including Novak, have made false statements about Blaylock to the public at large, and/or to so many persons that these statements are substantially certain to become public knowledge.

107.    Among other things, Starke and/or "Evgeny Bolotin" claim to have gotten "incredible feedback" from "audience members" shown images included in the Starke Video Interview and emailed to Blaylock's friends and family, and claim to be in "talks" with "USA Today, Reuters, and, of course, Rolling Stone magazine as well as Amazon and Netflix . . . ." Starke also claims that "Rolling Stone & USA Today, as well as many others, have sought to do an exclusive with me before the release of the documentary."

108.    The statements made about Blaylock, including those alleged in paragraphs 55 to 73 above and the accompanying exhibits, and in paragraphs 98 and 103 are highly offensive to the reasonable person and place Blaylock in a false light.

36

109.    Upon information and belief, Starke, individually and acting as or through "Evgeny Bolotin," Keith Berglund, Novak, and upon information and belief, others acting at the direction of Starke and/or on her behalf made such statements with knowledge that they were false, or alternatively negligently and/or with reckless disregard for their truth or falsity.

110.    These statements proximately caused Blaylock actual injury, including but not limited to mental suffering, humiliation and emotional distress from these false facts having been exposed to public view.

**COUNT III**
**Invasion of Privacy: Public Disclosure of Private Facts**
**(Against All Defendants)**

111.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

112.    Upon information and belief, Starke, individually and acting as or through "Evgeny Bolotin," Novak, and upon information and belief, others acting at the direction of Starke and/or on her behalf have disclosed private facts about Blaylock to the public at large, and/or to so many persons that these statements are substantially certain to become public knowledge.  These private facts include, as alleged in paragraphs 55 to 73 above and accompanying exhibits, private and intimate text messages and photos taken from Blaylock's Electronic Devices without his consent, and photos of Blaylock's prescription medication and legal, recreational drugs. These private facts were then further disclosed through the Website by Starke and Novak.

113.    Among other things, Starke, Novak, and/or "Evgeny Bolotin" claim to have gotten "incredible feedback" from "audience members" shown images included in the Starke Video Interview and emailed to Blaylock's friends and family, and claim to be in "talks" with "USA Today, Reuters, and, of course, Rolling Stone magazine as well as Amazon and Netflix . . . ." Starke also claims that "Rolling Stone & USA Today, as well as many others, have sought to do

an exclusive with me before the release of the documentary."

114.    The facts disclosed about Blaylock, including those alleged in paragraphs 55 to 73 above and the accompanying exhibits, are not of public concern and are highly offensive to a reasonable person of ordinary sensibilities.

115.    These statements proximately caused Blaylock actual injury, including but not limited to actual harm to his reputation, humiliation and emotional distress.

## COUNT IV
### Invasion of Privacy: Intrusion Upon Seclusion
### (Against Starke)

116.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

117.    Blaylock possesses a reasonable and legitimate expectation of privacy with respect to information and/or electronic communications stored on his password protected Electronic Devices and his electronic communications contained on their respective servers.  As alleged in paragraphs 55 to 73 above and accompanying exhibits, upon information and belief, Starke accessed, looked at and copied information from Blaylock's Electronic Devices without his consent.  This information includes private and intimate text messages and photos, and photos of Blaylock's prescription medications and legal, recreational drugs.

118.    Starke's actions in this regard constitute an invasion or interference by physical intrusion, by use of Stark's sense of sight and hearing and/or by use of some other form of investigation or examination, into a place where Blaylock had secluded himself, and/or into his private or secret concerns, in a manner that would be highly offensive to the ordinary reasonable person.

119.    These actions by Starke proximately caused Blaylock actual injury, including but not limited to mental suffering, humiliation and emotional distress from these false facts having

38

been exposed to public view.

## COUNT V
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

120.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

121.    The acts of Defendant Starke, "Evgeny Bolotin" and Novak, including those alleged in paragraphs 32 to 73 above, constitute outrageous and extreme conduct.

122.    Defendants committed such acts intentionally and/or recklessly, as evidenced, for example, by: (i) attempting to extort money from Blaylock by distributing private, intimate, and often outright false information concerning him (including by the Starke Video Interview) to his family and friends, and threatening to distribute that same information to a wider public audience under the false pretense of creating a "documentary;" (ii) accessing and copying from Blaylock's Electronic Devices what, upon information and belief, they knew to be Blaylock's private and intimate texts and images, and sending that information to third parties; (iii) spreading to Blaylock's family and friends, and upon information and belief, the public at large, what they knew or should have known to be false allegations against Blaylock; and (iv) creating, publishing, and updating a defamatory website directly targeting Plaintiff.

123.    These actions by Defendants proximately caused Blaylock actual injury, including but not limited to severe emotional distress.

## COUNT VI
### Civil Conspiracy
### (Against All Defendants)

124.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

39

125.     Upon information and belief, Defendants agreed amongst themselves to participate in unlawful acts, including but not limited to criminal extortion, defamation, invasion of privacy and violation of the Computer Fraud and Abuse Act, the Stored Communications Act, the D.C. Uniform Civil Remedies for Unauthorized Disclosure of Intimate Images Act of 2024, and the Violence Against Women Reauthorization Act.

126.     Upon information and belief, each Defendant party to this agreement performed an overt act in furtherance of their common scheme, including but not limited to: (i) attempting to extort money from Blaylock by distributing private, intimate, and often outright false information concerning him (including in the Starke Video Interview and on the Website) to his family and friends, and threatening to distribute that same information to a wider public audience under the false pretense of creating a "documentary;" (ii) accessing and copying from Blaylock's Electronic Devices what, upon information and belief, they knew to be Blaylock's private and intimate texts and images, and sending that information to third parties; (iii) spreading to Blaylock's family and friends, and upon information and belief, the public at large, what they knew or should have known to be false allegations against Blaylock; and (iv) creating, publishing, and updating the unlawful Website.

127.     By virtue of their common scheme, each Defendant is vicariously liable for the actions of each other Defendant with respect to the unlawful activity alleged herein.

128.     These actions by Defendants caused Blaylock actual monetary damages, in an amount to be determined by a trial on this matter, but in excess of $75,000.

## COUNT VII
### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030
### (Against Starke)

129.     Plaintiff re-incorporates and re-alleges each and every allegation contained above

as if fully set forth herein.

130.    Upon information and belief, Starke obtained information pertaining to Blaylock's private life by accessing his Electronic Devices.

131.    The Electronic Devices are computers used in and/or affecting interstate and foreign commerce or communication, and are thus protected computers under 18 U.S.C. § 1030.

132.    Upon information and belief, Starke intentionally accessed Blaylock's Electronic Devices, without authorization.

133.    Starke's access to Blaylock's Electronic Devices was not authorized because, among other things, at no point did Blaylock grant Starke permission to access his Electronic Devices.  In addition, at no time did Blaylock disclose to Starke any passwords or information that would have enabled Starke to bypass Blaylock's authentication gates or password restrictions and subsequently access the information in Blaylock's Electronic Devices.

134.    As a result of Starke's intentional unauthorized access to Blaylock's Electronic Devices, Starke obtained information from Blaylock's protected computers, including but not limited to (as alleged in paragraphs 55 to 73 above) the information contained in the Starke Video Interview and emails sent to Blaylock, his family and friends.

135.    Starke's intentional unauthorized acts, as set forth above, amount to wrongful conduct in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) because they resulted in her obtaining information belonging to Blaylock from Blaylock's protected computers.

136.    Upon information and belief, the intentional conduct of Starke was for the purpose of extorting Blaylock and pressuring him into carrying out Starke's demands, as alleged in paragraphs 32 to 73 above and accompanying exhibits.

137.    Blaylock has been and continues to be damaged by Starke's wrongful conduct in violation of the Computer Fraud and Abuse Act, 18. U.S.C. § 1030(a)(2)(C).  Starke's actions have resulted in a loss to Blaylock of more than $5,000 within one year, including the cost to respond to and remedy Starke's conduct.

138.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff Blaylock seeks compensatory damages, injunctive relief, other equitable relief, and such other relief as this Court deems just and proper.

## COUNT VIII
**Violation of the Stored Communications Act, 18 U.S.C. § 2701, et seq.**
**(Against Starke)**

139.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

140.    At all times material herein, Blaylock's electronic communications, including but not limited to, Blaylock's text messages, are in electronic storage on servers associated with the Blaylock's social media accounts, dating accounts, e-mail accounts, cloud accounts, and other applicable facilities through which an electronic communication service is provided (the "Servers").

141.    Upon information and belief, Starke intentionally accessed the Servers without authorization.

142.    Starke's access to the Servers was not authorized because, among other things, at no point did Blaylock grant Starke permission to access his instant messages, text messages, emails, social media accounts, dating accounts, e-mail accounts, or cloud accounts.  In addition, at no time did Blaylock disclose to Starke any passwords or information that would have enabled Starke to bypass Blaylock's authentication gates or password restrictions and subsequently access such information.

42

143.    Upon information and belief, Starke obtained unauthorized access to Blaylock's electronic communications while they were in electronic storage on the Servers.  For example, Starke states in the Starke Video Interview that she "saw text messages" that Blaylock did not authorize her to access.

144.    Starke's wrongful course of conduct constitutes a violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2701(a).

145.    The electronic communications obtained by Starke in violation of 18. U.S.C. §2701(a) include, but are not limited to, those set forth in paragraphs 63 to 73 above.

146.    Upon information and belief, the intentional conduct of Starke was for the purpose of extorting Blaylock and pressuring Blaylock into carrying out Starke's demands, as alleged in paragraphs 32 to 73 above.

147.    Blaylock has been and continues to be damaged by Starke's wrongful conduct in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2701(a).  Pursuant to 18 U.S.C. § 2707(c), Blaylock is entitled to actual damages and disgorgement of any profits Starke has earned as a result of Starke's illegal conduct, or, in the alternative, statutory damages in an amount that equals or exceeds $1,000.00; such preliminary or other equitable or declaratory relief as may be appropriate; punitive damages, as well as costs and reasonable attorneys' fees. Law

**COUNT IX**
**Violation of the Uniform Civil Remedies for Unauthorized Disclosure of Intimate Images**
**Act of 2024, D.C Law 25-268**
**(Against All Defendants)**

148.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

149.    District of Columbia law provides for a civil cause of action for "a depicted individual who is identifiable and who suffers harm from a person's intentional disclosure or

threatened disclosure of an intimate image that was private without the depicted individual's consent…if the person knew or acted with reckless disregard for whether: 1) the depicted individual did not consent to the disclosure; 2) the intimate image was private; and 3) the depicted individual was identifiable." D.C. Code § 7-2162.

150.    "Depicted individual" means an individual whose body is shown in whole or in part in an intimate image. D.C. Code § 7-2161(2). "'Identifiable' means recognizable by a person other than the depicted individual: (A) From an intimate image itself; or (B) From an intimate image and identifying characteristic displayed in connection with the intimate image." D.C. Code § 7-2161(4). "Identifying characteristic" is defined as "information that may be used to identify a depicted individual." D.C. Code § 7-2161(5).

151.    An intimate image "means a photograph, film, video recording, or other similar medium that shows: 1) the … pubic area … of a depicted individual; or 2) a depicted individual engaging in or being subjected to sexual conduct." D.C. Code § 7-2161(7).

152.    Here, Defendants are maintaining a public website (the Website) that includes multiple intimate images of Plaintiff.

153.    The photos in question depict Plaintiff's pubic area and qualify as "intimate images" under D.C. law.

154.    The photos in question identify Plaintiff by, among other things, including his face in the intimate images and including his name on the Website in association with the intimate images.

155.    Under D.C. law, "disclose" and "disclosure" means "transfer, publication, or distribution to another person." D.C. Code § 7-2161(3).

156.    The intimate images of Plaintiff were, and continue to be, disclosed when they were

44

published on the Website.

157.    Under D.C. law, "consent" means "affirmative, conscious, and voluntary authorization by an individual with legal capacity to give authorization." D.C. Code § 7-2161(1). The fact that Plaintiff consented to the creation of an intimate visual depiction does not establish the Plaintiff's consent to the distribution of the intimate visual depiction. Further, the fact that the Plaintiff disclosed the intimate visual depiction to someone else does not establish the Plaintiff's consent to further disclosure of the intimate visual depiction by the Defendants. D.C. Code § 7-2162(c).

158.    The disclosure of the intimate visual depictions of Plaintiff was nonconsensual as they were published on the internet without his affirmation or authorization.

159.    Defendants knew that Plaintiff did not consent to any disclosure of the intimate visual depictions, as evidenced by the defamatory nature of the content on the Website in association with the intimate images, and the smear campaign undertaken by Defendants to spread such content to Plaintiff's friends and family.

160.    Under D.C. law, an individual may recover the actual damages sustained by the individual or statutory damages, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred; and the court may, in addition to any other relief available at law, award punitive damages, order equitable relief, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to cease display or disclosure of the visual depiction. D.C. Code § 7-2165.

161.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered actual damages in an amount to be proven at trial.

**COUNT X**
**Violation of the Violence Against Women Reauthorization Act, 15 U.S.C. § 6851**

45

**(Against All Defendants)**

162.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

163.    A claim under the Violence Against Women Reauthorization Act (VAWRA) requires: 1) an intimate visual depiction; 2) disclosure in interstate or foreign commerce; 3) nonconsensual disclosure; and 4) disclosure by the defendant. 15 U.S.C. § 6851(b)(1)(A).

164.    As relevant here, an intimate visual depiction under the VAWRA means "a visual depiction, as defined in section 2256(5) of title 18[2] that depicts . . . the … pubic area … of an identifiable individual ..." 15 U.S.C. § 6851(a)(5)(A).

165.    Under 15 U.S.C. § 6851, the depicted individual is "an individual whose body appears in whole or in part in an intimate visual depiction and who is identifiable by virtue of the person's face, likeness, or other distinguishing characteristic, or from information displayed in connection with the visual depiction." 15 U.S.C. § 6851(a)(3).

166.    Here, Defendants are maintaining a public website that includes multiple intimate visual depictions of Plaintiff.

167.    The photos in question depict Plaintiff's pubic area and qualify as "intimate visual depictions" under the VAWRA.

168.    The photos in question identify Plaintiff by, among other things, including his face in the intimate images and including his name on the Website in association with the intimate images.

169.    Under the VAWRA, disclose means "to transfer, publish, distribute, or make

---

[2] "'Visual depiction' includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format." 18 U.S.C. § 2256(5).

accessible." 15 U.S.C. § 6851(a)(4).

170.    The intimate visual depictions of Plaintiff were and continue to be disclosed in interstate or foreign commerce when they were published on the Website.

171.    Under the VAWRA, "consent" means "an affirmative, conscious, and voluntary authorization made by the individual free from force, fraud, misrepresentation, or coercion." 15 U.S.C. §6851(a)(2). The fact that Plaintiff consented to the creation of the intimate visual depiction does not establish the Plaintiff's consent to the distribution of the intimate visual depiction. Further, the fact that the Plaintiff disclosed the intimate visual depiction to someone else does not establish the Plaintiff's consent to further disclosure of the intimate visual depiction by the Defendants. 15 U.S.C. § 6851(b)(2)(A)-(B).

172.    The disclosure of the intimate visual depictions of Plaintiff was nonconsensual as they were published on the internet without his affirmation or authorization.

173.    Defendants knew that Plaintiff did not consent to any disclosure of the intimate visual depictions, as evidenced by the defamatory nature of the content on the Website in association with the intimate images, and the smear campaign undertaken by Defendants to spread such content to Plaintiff's friends and family.

174.    Under the VAWRA, an individual may recover the actual damages sustained by the individual or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred; and the court may, in addition to any other relief available at law, order equitable relief, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to cease display or disclosure of the visual depiction. 15 U.S.C. § 6851(b)(3).

175.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered actual

47

damages in an amount to be proven at trial.

**COUNT XI**
**Common Law Trespass to Chattels**
**(Against Starke)**

176.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

177.    Upon information and belief, Starke has by-passed the password restrictions on the Blaylock's Electronic Devices, without authority, with the intent to trespass on Blaylock's Electronic Devices.

178.    Upon information and belief, Starke has used a computer and/or computer network, without authority, with the intent to trespass on the electronic communications stored in the Servers.

179.    Upon information and belief, Starke's conduct has resulted in unauthorized access to Blaylock's Electronic Devices and information and/or documents stored on the Servers, and in the unauthorized intrusion into the Electronic Devices and the Servers.

180.    Starke's intrusion has invaded and disrupted Blaylock's possession and control over its property.

181.    Starke intentionally committed this unlawful and unauthorized conduct.

182.    Upon information and belief, the intentional conduct of Starke was for the purpose of extorting Blaylock and pressuring Blaylock into carrying out Starke's demands, as alleged in paragraphs 32 to 73 above.

183.    Starke's actions have caused injury to Blaylock and have interfered with the possessory interests of Blaylock over his Electronic Devices and the Servers.

184.    These actions by Defendants caused Blaylock actual monetary damages, in an amount to be determined by a trial on this matter, but in excess of $75,000.

## COUNT XII
### Declaratory Relief
### (Against Starke)

185.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

186.    Pursuant to 28 U.S.C. § 2201, this court may issue a declaratory judgment.

187.    As set forth in paragraph 48 above, Starke claims that she is entitled to money and other relief from Blaylock as follows:

a.    Starke claims that Blaylock promised to marry Starke.

b.    Starke claims that Blaylock promised to buy Starke not only the house in Bradenton, Florida, but also a second apartment in Miami, Florida that cost another $750,000.

c.    Starke claims that Blaylock promised to gift Starke's son $2,000,000.

d.    Starke claims that Blaylock promised to pay off the mortgage on Starke's home in Beverly Hills, California in full.

e.    Starke claims that Blaylock promised to pay Starke $500,000 per year to be his personal general counsel, and owes her $2,000,000 for four years of past services.

f.    Starke claims that Blaylock promised to be 50/50 partners with Starke in a real estate investment entity called Middleton Partners.

188.    None of the alleged promises set forth in paragraph 48 above are legally enforceable.

189.    Despite the requests of Blaylock's counsel, Starke has not produced anything in writing that memorializes the promises set forth in paragraph 48 above.

190.    As a result of the facts described in the foregoing paragraphs, there exists an actual controversy of a justiciable nature between Plaintiff and Defendant that is within the jurisdiction

of this court, involving the rights and liabilities of the parties.

191.    A declaratory judgment by this court would terminate this controversy.

192.    Blaylock is entitled to a declaratory judgment from this court, determining that the promises set forth in paragraph 48 above are unenforceable against Blaylock.

## COUNT XIII
### Declaratory and Injunctive Relief
### (Against All Defendants)

193.    Plaintiff re-incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

194.    Starke, individually and acting as or through "Evgeny Bolotin," and upon information and belief, others acting at the direction of Starke and/or on her behalf, have disclosed and threatened to disclose information that Starke illegally obtained from Blaylock's Electronic Devices and the Servers.

195.    Starke, individually and acting as or through "Evgeny Bolotin," and upon information and belief, others acting at the direction of Starke and/or on her behalf, have disclosed and threatened to disclose the Starke Video Interview, which contains false and defamatory information regarding Blaylock.

196.    Starke has also refused to disclose to Blaylock the contents of the "back-up files" referenced in the Spoilation Letter.

197.    Upon information and belief, the willful and intentional conduct of Starke and the other Defendants acting in concert with her has been for the purpose of extorting money from him.

198.    As a result of the facts described in the foregoing paragraphs, there exists an actual controversy of a justiciable nature between Plaintiff and Defendant that is within the jurisdiction of this court, involving the rights and liabilities of the parties.

199.    In addition to the damages and other relief sought herein, Plaintiff respectfully

50

requests this Court enter judgment against all Defendants: (a) declaring that their actions as described in the aforementioned paragraphs, were unlawful; (b) declaring that any future disclosure of information obtained in the manner described in the aforementioned paragraphs is unlawful; (c) enjoining Starke and the other Defendants preliminarily and permanently from the actions described herein consistent with the law; (d) enjoining Starke from using as evidence in litigation information unlawfully obtained from Plaintiff as outlined above; (e) ordering that Defendants return to Plaintiff all materials belonging to Plaintiff in their possession, custody and control, including but not limited to all copies of all information taken from Blaylock's Electronic Devices and the "back-up" files referenced in the October 2022 Letter; and (f) affording Plaintiff such other and further relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants and declaratory and injunctive relief as follows:

A.    A permanent and preliminary injunction enjoining and restraining Starke, Novak, their representatives and agents, and all persons or entities acting in concert with them prior to, during, and after the pendency of this action perpetually from further disclosure of the Starke Video Interview;

B.    A permanent and preliminary injunction enjoining and restraining Starke, Novak, their representatives and agents, all persons or entities acting in concert with them prior to, during, and after the pendency of this action perpetually from further dissemination of false and defamatory statements regarding Blaylock, including but not limited to the statements contained in paragraphs 55 to 73 above, and ordering them to retract those statements;

51

C.   A permanent and preliminary injunction enjoining and restraining Starke, Novak their representatives and agents, and all persons or entities acting in concert with them prior to, during, and after the pendency of this action perpetually from accessing Blaylock's Electronic Devices and the Servers;

D.   A permanent and preliminary injunction enjoining and restraining Starke, Novak their representatives and agents, and all persons or entities acting in concert with them prior to, during, and after the pendency of this action perpetually from further disclosure of information and electronic communications obtained from Blaylock's Electronic Devices and Blaylock's Servers without Blaylock's permission;

E.   An order requiring Defendant Starke to provide Plaintiff with the "back-up files" referenced in the October 2022 Letter;

F.   An order requiring Defendants to permanently cease operations of the Website;

G.   An order that ownership of the Website, its url and domain name be transferred to Plaintiff;

H.   A judgment declaring that any past, present, and future intentional access of information from Blaylock's Electronic Devices by Starke, her representatives and her agents, and all persons or entities acting in concert with her prior to, during, and after the pendency of this action, was and would be without authorization under the Computer Fraud and Abuse Act;

I.   A judgment declaring that any past, present, and future intentional access of information from Blaylock's Servers by Starke, her representatives and her agents, and all persons or entities acting in concert with her prior to, during, and after the pendency of this action, was and would be without authorization under the Stored

52

Communications Act;

J.      A judgment declaring that any past, present, and future intentional access of Blaylock's Electronic Devices or Blaylock's Servers by Starke, her representatives and her agents, and all persons or entities acting in concert with her prior to, during, and after the pendency of this action, was and would be an illegal interference with Blaylock's privacy and possessory interests;

K.      A judgment declaring that the alleged promises by Blaylock as set forth in paragraph 48 above are not enforceable;

L.      An award to Blaylock of damages, including, but not limited to, actual damages, compensatory damages, statutory damages, punitive damages, disgorgement of any profits Defendants have earned as a result of their illegal conduct, as permitted by law, in an amount to be proved at trial;

M.      An award to Blaylock of his costs of suit, including, but not limited to, reasonable attorney's fees, as permitted by law; and

N.      Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.


Dated:  December 9, 2025              **VENABLE LLP**

                                      */s/Jessie F. Beeber*
                                      David A. Levie (D.C. Bar No. 1034550)
                                      Jessie F. Beeber (admitted *pro hac vice*)
                                      William Briggs II (admitted pro hac vice)
                                      Jacob W. Goodman (*pro hac vice* application to be filed)
                                      600 Massachusetts Avenue, N.W.
                                      Washington, DC 20001
                                      Phone: 202-344-4000
                                      Fax: 202-344-8300

53

DALevie@Venable.com
JBeeber@Venable.com
WJBriggs@Venable.com
JWGoodman@Venable.com

*Attorneys for Dan M. Blaylock*