# Exhibit A

June 18, 2022

Hi Petra;

Upon reading your recent communications, I find myself placed in a difficult position.

I value our friendship. We have shared emotional, intimate and private thoughts, feelings, and times together which have been genuinely lovely. And we have done so while being respectful of each other's boundaries, knowing we each have lives with parts which do not overlap with each other. The nice times have been made possible due to these understandings.

Life involves adversity. It comes in many different shapes and sizes and can show up when one is least expecting it. You and I have each seen our share of it.

I mention this because in recent years, I have tried to assist you and your son in ways I hope you have found meaningful, even though there has been no commitment, duty, or obligation on my part to do so.

At the same time, I have had concerns about some things you have told me which have caused me pause. Specifically, there are things you have told me the veracity of which I have questioned to myself. But each time, I have been able to compartmentalize those concerns and set them aside in my mind.

However, your recent communications cause me to reconsider the matters I have been compartmentalizing and setting aside. Why? Because your recent communications contain profound misrepresentations completely mischaracterizing events I have been present for.

For example, we have had quiet, tender conversations about intimacy which at one point included the topic of anal sex. Together, we consensually looked in that direction and on one occasion, experimented very briefly before pretty much immediately coming to the shared conclusion that it was not something for us.

Not every component of human sexuality is right for every person. But the very process of sharing thoughts and conversations of the most private areas of one's life can itself be a lovely thing, even when two people decide a particular activity is not right for them. And that is what that was. Two people connecting in a private way and in so doing, bringing tenderness and comfort to each other in a difficult world.

However, in your recent communications, your depiction of shared, consensual moments has veered far away from what they were, into descriptions I find alarming and intensely misrepresentative.

Therefore, I would like to address some things. Let's start with a chronology.

You and I connected in approximately 2018 and began being intimate. Near the end of 2019, I ordered this toy on Amazon. A few months went by before we used it and during that time, it sat in my drawer. When we did use it, you said it felt different and enjoyable. You did not ask that it be removed and there was no complaint of pain. It did not, however, seem to add any marked increase to our experience, so we did not revisit using it and I threw it away. It was well after that (a couple months?) that you said you were having discomfort in that area of your body.

This item was never used on another person. I purchased it for us to try, which we did. I then discarded it having no use for it if it was not something that was right for us.

You write that in December of 2020, you mentioned by text to me that you might bring a suit against this device. This thing had been long ago discarded by December of 2020 since there was no purpose in having it if we were not going to use it together.

I have no experience with product liability claims. You are saying you have to have that same item to bring a claim. That does not make sense to me, because I would think can just get the same item and make whatever legal argument is going to be made.

So when you say you mentioned in December of 2020 that you were thinking about bringing a claim, it did not occur to me that you would have to have it, and that is why I did not mention it had been long ago discarded. But what is really noteworthy here is that in December of 2020, you certainly did not ask if I still had it. Nor did you ask me to make sure I retained it if I did.

How is it reasonable for you to criticize me for not raising the issue that I did not have the item when you yourself did not raise the same issue - that you would want it and would need it? That point becomes even more pronounced when considering you are the one with professional training and knowledge on how evidence works, not me.

I also want to clearly push back on the suggestion that I had said or indicated we were in a monogamous relationship. I never, ever told you I would not see anyone else. And correspondingly, I never asked you the same.

I also adamantly take issue with your statement that I "shrieked" at you or that I called you to "scream and abuse" you. Petra, we had a conversation that was understandably emotional considering that you seemed to be trying to draw a connection between me and your cancer diagnosis. But I firmly disagree with how you are characterizing it. Neither of us would have continued to periodically see each other for several years if there was ever any abusive communication of any kind. It is quite simply not how you and I communicate with others.

Therefore, after reflecting on these issues, it is clear we need to conclude our relationship.

In stating that we need to end our relationship, I must ask that you not call, text, email, write, come to my home or reach out in anyway. We must have a clear and immediate parting of ways.

I do not say this from a place of anger. I wish nothing but great things for you and your son. However, it is done with assertiveness.

I sent 4 boxes of clothing, shoes, toiletries and paperwork to your home in Florida yesterday via Federal Express. Your red dress, which is currently at the dry cleaner, will also be shipped to you along with your 2 yoga related items as soon as the dress comes back from the cleaners.

I wish you the best Petra. But please respect my wishes as expressed above and do not contact me again.  If you do, I will need to engage counsel of my own.  I am sorry it has come to this, but the tone and content of your recent communications are so far from the

reality of what we shared, I don't know what you are thinking -- but I don't feel comfortable continuing contact of any kind between us.  So please do not contact me any further.

Wishing you well,

Dan

# Exhibit B

# Law Offices of Petra Starke

5619 Title Row Dr.
Bradenton, FL 34210
Ph: (310)948-5811
petrasmeltzer@gmail.com

October 26, 2022

Bruce Adams Blaylock, Esq.
4610 Elm St.
Bethesda, MD 20815

Via email & U.S. Mail

LETTER TO PRESERVE EVIDENCE

Dear Mr. Blaylock:

I have been advised that you are presently representing your brother, Dan McKinley Blaylock.

It is my understanding that you have been advising him on matters pertaining to Ms. Petra Starke.

Your brother has instructed me not to contact him directly, and, accordingly, I write to you today. This is in the nature of a LETTER TO PRESERVE EVIDENCE, sometimes referred to as a SPOLIATION LETTER.

This letter a will serve as a formal request that you and your employees and agents, as well as your brother, Dan M. Blaylock, and his employees, and agents, preserve and not alter any evidence of any kind, that relates to, in any way, the business and personal relationship that I, or any of my employees, agents or family members had with him, including but not limited to photographs, video recordings, recorded audio, computer media, documents, emails, texts, phone records, credit card statements and receipts, and all other evidence and things relating to their personal and business relationship presently in your or his possession or the possession of your employees or agents or family members. This includes, but is not limited to, all documents, whether paper, electronic or otherwise stored, relative to Ms. Starke and your brother. We fully expect for you to counsel your brother regarding this letter and to require that he advise his accountants, bank officers, Goldman Sachs, Wells Fargo, Trimark, Middleton Partners, Banyon Acquisition Corp, and any other business, or employers, as

well as any of their counselors and accountants and bank personnel or any other person with knowledge of any factual or documentary relationship to this matter.

Your brother in his last written communication to me, which forensic experts have advised my team you authored per its meta data, references your brother's assertion that he was well within his perception of reality that he was not in a monogamous relationship with Ms. Starke. At no point was this an accurate understanding. Sadly, a great deal of unethical behaviors that have been documented and categorized in my team's possession have not just been heartbreaking to me but put my health and well-being in jeopardy. Mr. Blaylock had an ethical obligation to disclose to me his treatment and conduct as it pertains to his sexual life and the conduct of his personal habits. We have back up files on the above behavior and history of his activities within his personal and business life and it is highly apparent that his behavior put my health and well-being at risk. Thus, this request includes any third parties your brother has had sexual relationship with during the last four years, including any and all of his online activities and electronic media.

In addition to the above, I specifically request that you preserve:

All photographs, videotapes, or other audio or computer generated media relating to their personal and/or business relationship, including but not limited to all family members.

All statements, notes, audio or video recordings and other materials or things obtained from any person having information respecting any and all business and personal relationship with Ms. Starke, any family member or any of those individuals whom have knowledge of the circumstances involving said relationships, whether personal or business related.

All computer, electronic or e-mail messages created in the last 4 years between your brother and any of his prior or present companies with respect to his equity investments and any agents or third parties, relating to the facts, circumstances, or background investigations of your brother while working for Trimark as well as any computer messages which relate to his personal or business relationship with Ms. Starke or any family members generated or received during the last 4 years.

Each and every request to preserve herein applies equally to anything that might have been shared with any third parties of a personal nature as well as business partners, associates, employees, consultants, and staff.

This request includes all evidence as outlined herein available today but survives this letter permanently.

Please retain and preserve all this evidence. A number of court decisions have permitted court sanctions or "destruction of evidence" lawsuits where a party

alters or fails to preserve important evidence after receiving written notice of a claim that also requests preservation of evidence. Unless I have your written explanation to the contrary within five business days from the date of this letter, I will presume you will strictly abide by all requests outlined above.

I have retained an attorney in Illinois for purposes of your reply and for purposes of discussion of resolving all issues between the parties. He is expecting to hear from you.

Louis I. Lang
4504 W. Oakton
Skokie, Illinois 60076
847 334 1131
Reploulang@aol.com


Very truly yours,


Petra Starke, Esq.


cc: Louis I. Lang

# Exhibit C



VENABLE LLP | 1290 AVENUE OF THE AMERICAS
20TH FLOOR | NEW YORK, NY 10104
T +1 212.218.2100  F +1 212.218.2200  Venable.com

November 23, 2022

Jessie F. Beeber
**T 212.808.5677**
jbeeber@Venable.com

**BY EMAIL**

Louis I. Lang
4508 Oakton Street
Skokie, Illinois 60076
Reploulang@aol.com

     **Re:    Response to Letter from Petra Starke dated October 26, 2022**

Dear Mr. Lang:

     We are litigation counsel for Dan M. Blaylock. We understand that you represent Petra Starke in connection with the letter Ms. Starke wrote to Mr. Blaylock's brother, Bruce A. Blaylock, Esq., dated October 26, 2022, regarding the preservation of evidence (the "Letter"). For the reasons outlined below, we categorically reject the presumed basis for Ms. Starke's Letter. Moreover, based on statements she made in the Letter, Ms. Starke has exposed herself to substantial liability and a significant award of damages against her. Let this correspondence serve as a warning that should she continue along this path it will prove disastrous for her.

     Ms. Starke's Letter demands that Mr. Blaylock, his brother, and their employees and agents preserve evidence related "in any way [to] the business and personal relationship that [Ms. Starke], or any of [her] employees, agents or family members had" with Mr. Blaylock. The Letter purports to impose a duty of preservation not only on Mr. Blaylock, his brother, and their employees and agents, but also "any third parties [Mr. Blaylock] has had sexual relationship [sic] with during the last four years," all of Mr. Blaylock's accountants, all "bank officers," including "Goldman Sachs, Wells Fargo, Trimark, Middleton Partners, Banyon Acquisition Corp.," and "any other business, or employers [sic], as well as any of their counselors and accountants and bank personnel or any other person with knowledge of any factual or documentary relationship [sic] to this matter."

     We are not aware of any legal basis whatsoever for Ms. Starke's broad, sweeping, and at points unintelligible, demands. The Letter does not articulate any such legal basis, nor have we been able to imagine one. As best as we can tell, Ms. Starke is attempting to use the Letter to prove to Mr. Blaylock that she knows where his business and personal assets are held, and to scare Mr. Blaylock into believing that Ms. Starke intends to reveal "his sexual life and the conduct of his personal habits" to the public. Rest assured that Mr. Blaylock is not scared. We will not be responding substantively to Ms. Starke's baseless threats and insinuations, except to say that we find it particularly hypocritical that Ms. Starke, a married woman who engaged in at least one extramarital affair, sees fit to accuse Mr. Blaylock of "unethical behavior." Please know that Mr. Blaylock will also take any and all legal steps necessary to protect himself from Ms. Starke's actions, including actions taken on her behalf by you.



Louis I. Lang
November 23, 2022
Page 2

Moreover, the Letter establishes that Ms. Starke has likely violated numerous state and federal statutes designed to protect Mr. Blaylock's personal and business information from unauthorized access and dissemination. For example, Ms. Starke states in the Letter that she possesses "back up files" on Mr. Blaylock's "behavior and history of his activities within his personal and business life," information that she apparently obtained during the course of the parties' relationship. Based on Ms. Starke's Letter, we believe there is a high likelihood that Ms. Starke obtained that information through unauthorized access and/or unlawful interception of information on Mr. Blaylock's electronic devices and servers (including his mobile phone and computer). If that is the case, then Ms. Starke is liable for violations of federal and state law, including: the Electronics Communications Privacy Act (the Wiretap Act), 18 U.S.C. §§ 2510-2523; the Stored Communications Act, 18 U.S.C. §§ 2701-2713; the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; D.C. Code § 23-542; the Florida Computer Crimes Act, F.S. §§ 815.01-815.07; and the Florida Computer Abuse and Data Recovery Act, F.S. §§ 668.801-668.805. Ms. Starke may also be liable for trespass and invasion of privacy by intrusion under applicable state law. These violations of federal and state laws carry substantial penalties and expose Ms. Starke to a substantial award of damages against her for such conduct.

**In light of Ms. Starke's Letter, we demand that any and all information in Ms. Starke's possession, custody or control regarding the business or personal affairs of Mr. Blaylock, including the "back up files" she references in the Letter, be returned to us immediately. Ms. Stark's failure to comply with this demand will be to her peril.**

In addition, given Ms. Starke's apparent commission of numerous legal violations, we demand that Ms. Starke preserve any and all documents and ESI in her possession, custody or control regarding information she has about Mr. Blaylock and his business or personal affairs. This includes any written, printed, handwritten, typed, graphic, photographic or recorded matter of any kind or character, however produced or reproduced, and any tangible thing which, in whole or in part, illustrates or conveys information, whether produced or stored on paper, cards, tapes, disks, belts, charts, film, computer storage devices, microfilm, magnetic and electronic recordings, sound or video recordings, computer print-outs or records. This also includes, but is not limited to, writings, electronic mail, letters, memoranda, notes, journals, diaries, books, magazines, pamphlets, fliers, papers, statements, records, cables, wires, telegrams, "post it" notes, photographs, movies, or recordings. This also includes any and all drafts and non-identical copies of the aforementioned, including copies bearing notations and marks not found on the original, and any attachments or enclosures to any document. "ESI" means any information stored in electronic form, whether an original, draft, or a copy, however reproduced, and each and everything from which information can be processed or transcribed.

Finally, Mr. Blaylock has asked us to address the fact that he has loaned Ms. Starke over $1,000,000, none of which has been paid back. Mr. Blaylock would like Ms. Starke to make

**VENABLE** LLP

Louis I. Lang
November 23, 2022
Page 3

immediate arrangements to repay him, or alternatively he will report to the IRS the full amount he paid to her.

While we are open to discussing Ms. Starke's malfeasance with you, if Ms. Starke does not comply with this letter's demands, Mr. Blaylock may have no other choice but to pursue legal action against Ms. Starke. I trust that Ms. Starke will govern herself accordingly.

This letter does not constitute a complete or exhaustive statement of all of Mr. Blaylock's rights, claims, contentions, or legal theories. Nothing stated herein is intended, nor should it be deemed, to constitute a waiver or relinquishment of any of Mr. Blaylock's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

Very truly yours,

Jessie F. Beeber

# Exhibit D



**From:** Keith Berglund
**Date:** Thursday, October 26, 2023 at 4:03 PM
**To:** Dan Blaylock
**Subject:** Fwd: Petra Starke Documentary

Please see the below email from my Client Petra Smeltzer Starke.

---------- Forwarded message ---------
From: **Petra Smeltzer Starke**
Date: Thu, Oct 26, 2023 at 12:24 AM
Subject: Petra Starke Documentary
To: keithw.berglund

Dear Keith:

REDACTED

Here is a list of potential candidates to be interviewed for our documentary being directed and produced by the former Chicago Tribune's investigative reporter & documentarian Alfredo De Villa. As you may already know, Mr De Villa also produced movies and directed movies for Sony, Universal, as well as Lionsgate, and AMC.

Our goal is to be very fair and equitable in how we present the circumstances surrounding my relationship with Dan Blaylock and my struggle to beat cancer. Below is a link which has been time-coded by the studio with some of our footage which we are preparing to expand and begin to distribute both in America and outside of the United States. In conjunction with our anticipated and planned release of the documentary, we are in talks with both USA Today, Reuters, and, of course, Rolling Stone magazine as well as Amazon and Netflix to cross promote both my story as well as the documentary.

Please share the below link with our list of individuals we hope and pray will take the time to be interviewed by our director, Alfredo De Villa. We can schedule interviews in November either in Washington DC, Chicago or Beverly hills. Rolling Stone & USA Today, as well as many others, have sought to do an exclusive with me before the release of the documentary.

It is for that very reason that I wish to ask those that want to tell their side of the story to be allowed to. To take this one step further, we will give them editorial control of both their interviews and their footage.

Watching the footage below is not for the faint of heart nor is it for those people who do not believe women who have been raped. If this can happen to a White House lawyer, it can happen to anyone. Nonetheless my distributors and my director want to hear both sides of the story before we release the film.

Thank you Keith and please let everyone know we will be glad to film each and every person before Thanksgiving and, if more convenient after Thanksgiving, but no later than December 1st as we'll be turning in all the footage to the editors, the distribution company, and of course the media for them to review.

Petra

Here is the link:

https://vimeo.com███████████

Password: !134679!

# Exhibit E



2049 CENTURY PARK EAST   SUITE 2300   LOS ANGELES, CA 90067
T 310.229.9900  F 310.229.9901   www.Venable.com

November 20, 2023

William J. Briggs, II

t 310.229.9933
f 310.229.9901
wjbriggs@venable.com

CONFIDENTIAL LEGAL NOTICE
PUBLICATION OR DISSEMINATION IS PROHIBITED

**VIA EMAIL**

Evgeny Bolotin

▉▉▉▉▉▉▉▉▉▉

     **Re:    Petra Starke "Documentary" / Dan Blaylock**

Dear Mr. Bolotin:

We are litigation counsel for Dan Blaylock ("Mr. Blaylock"), one of the subjects of Petra Starke's so-called Documentary ("the Proposed Documentary") about her life that you have circulated today to several individuals, including but not limited to, Dan B. Duke, Bruce Blaylock, and Frazier Blaylock.  This letter concerns your plans to produce, publish, and distribute the Proposed Documentary.

There are substantial legal restrictions on an individual's right to produce, publish and distribute a film (documentary) about private figures which are fundamentally untruthful, defamatory, invades a person's right of privacy, wrongfully appropriates or exploits the person's right of publicity, and promotes the film in an unfair and misleading way.  Here, Mr. Blaylock strongly objects to and will exercise his legal rights and remedies regarding the production, publication and distribution of the Proposed Documentary to the extent that it is defamatory, invades his right of privacy, commercially appropriates his right of publicity, uses fiction-masquerading-as-fact, misrepresents him, and alleges that he may have participated in the Proposed Documentary, or otherwise violates his rights in the ways described in this letter.

To be clear, Mr. Blaylock nor any of his direct family members have been interviewed for, nor have they cooperated or consented to participate in any way in the production and publication of, the Proposed Documentary.  Indeed, for several reasons, some of which are discussed in this letter, my client objects to the production and publication and distribution of the Proposed Documentary and therefore will not consent to or otherwise authorize, sponsor, endorse or support the production or publication or distribution of the Proposed Documentary.  Among other reasons, direct family members of Mr. Blaylock who have some personal knowledge about him and his life will not give interviews for the Proposed Documentary, leaving Ms. Starke to merely republish and regurgitate

VENABLE LLP

---

Evgeny Bolotin
November 20, 2023
Page 2

fabricated and fictionalized episodes and incidents about him. Such conduct exposes Ms. Starke and all those who act in concert with her to substantial liability and damages.

In a segment of the Documentary Ms. Starke describes several alleged incidents that involve Mr. Blaylock as follows:

He raped me on two occasions. He forcibly sodomized me twice, once with a butt plug. His use of the butt plug to sodomize me caused me rectal cancer.

Each of the above summarized allegations are unequivocally false and defamatory. Ms. Starke was in a consensual sexual relationship with Mr. Blaylock even while she was married to George Starke. There is a plethora of evidence to establish the consensual sexual relationship between Ms. Starke and Mr. Blaylock, all of which is in the possession of Ms. Starke. Additionally, there is absolutely no medical or scientific evidence or peer-reviewed medical article that establishes an individual can acquire rectal cancer from anal sex or the insertion of sexual instruments into the anus. Ms. Starke's brazen and incredulous lies about Mr. Blaylock subject her to significant liability not only for her defamatory statements, but also for her theft of Mr. Blaylock's private information. As you appear to act in concert with Ms. Starke by your dissemination of such false and defamatory material and publication of Mr. Blaylock's private information, your conduct has been injurious to my client. Therefore, along with Ms. Starke, you are acting at your peril, and with conscious disregard of the truth or falsity about things you have produced and published and intend to distribute about Mr. Blaylock in the Proposed Documentary.

If you or anyone else further publishes the Proposed Documentary, it or they would similarly be acting with malice. By deciding arbitrarily whether to include certain information, anecdotes, events, conversations, etc. about Mr. Blaylock, it would be as if you were playing Russian Roulette with the truth, and would increase your exposure to liability and damages, which would inevitably result from the production and publication and distribution of the Proposed Documentary, since it would, no doubt, contain many things about my client are demonstrably false and defamatory, or fiction- masquerading-as-fact (whether defamatory or not), or which depict him in a false light in violation of his right of privacy.

This will constitute notice to you that if you do proceed to cause the further publication (*i.e.*, sending segments of the so-called documentary) of the Documentary about my client, which is, in whole or in part, false and defamatory of him, or which depicts him in a false light in violation of his right of privacy, or which constitutes publication of private facts in violation of his right of privacy, or constitutes a false endorsement or false designation of origin, leading the public to believe that Mr. Blaylock and/or members of their family have endorsed, or sponsored, or are otherwise participating or cooperating in the production, publication and distribution of the Documentary, you and all others acting in concert with you will be held accountable and liable for



Evgeny Bolotin
November 20, 2023
Page 3

any damages which any of them suffer, either in the form of loss of income, or other special damages, damage to reputation, or by the infliction of emotional distress.

As stated by the California Court of Appeal in *Eastwood v. Superior Court*, 149 Cal.App.3d 409, 198 Cal.Rptr. 342 (1983), the National Enquirer's use of Clint Eastwood's name and likeness in a story fictionalizing a romance involving Clint Eastwood gave rise to a valid cause of action by Eastwood against the National Enquirer for unauthorized commercial use of his name and likeness in violation of California Civil Code §3344 and the California common law right of publicity. Deliberate fictionalization presented as truth was held wrongful and actionable and exposed the National Enquirer to a claim for any damages that Clint Eastwood suffered, as well as a disgorgement of all profits that the National Enquirer obtained from the fictionalized story and an award of attorney fees.

Similarly, in the case involving the famous baseball pitcher Warren Spahn, the New York Court of Appeals held that the "knowing fictionalization [of a real person's life] . . . would amount to a literary license which is not only unnecessary to the protection of free speech, but destructive of an individual's right . . . to be free of the commercial exploitations of [the person's] name and personality." *Spahn v. Julian Messner, Inc.*, 18 NY.2d 324, 221 NE.2d 543, 274 NYS.2d 877 (1966), *vacated & remanded*, 387 U.S. 239, *motion to amend remittitur granted*, 20 NY.2d 752, 229 NE.2d 712, 283 NYS.2d 119, *affirmed on reconsideration*, 21 NY.2d 124, 233 NE.2d 84, 286 NYS.2d 832 (1967), *appealed dismissed*, 393 U.S. 1046 (1969).

Of course, any fabricated quotes or deliberate falsification of words uttered by a person in an interview equates with knowledge of falsity for purposes of the constitutional standard in *New York Times v. Sullivan* if the alteration results in a material change in the meaning conveyed by the statement, bearing upon the defamatory or otherwise actionable nature of the statement. As the Supreme Court stated in *Masson v. New Yorker Magazine*, 501 U.S. 496, 111 S.Ct. 2419 (1991):

"A quotation may be a devastating instrument for conveying false meaning."

In the 24-minute segment of the Documentary attached to your email, Ms. Starke ascribes certain statements to Mr. Blaylock. Ms. Starke has fabricated those statements from whole cloth. Simply stated, not a single word that Ms. Starke attempts to attribute to Mr. Blaylock is truthful. Rather, Ms. Starke has fictionalized and fabricated quotes that she attributes to Mr. Blaylock in an attempt to dramatize events and shock people at the expense of my client. Given the fact that Ms. Starke has irrefutable knowledge that quotes she attributes to my client are false, Ms. Starke is presumed to act with malice towards my client. Ms. Starke and all those who act in concert with her therefore expose themselves to liability for punitive damages.

**VENABLE** LLP

Evgeny Bolotin
November 20, 2023
Page 4

It is also well established that "defamation by implication stems not from what is literally stated, but what is implied."  (emphasis added).  *Forsher v. Bugliosi*, 26 Cal.3d 792, 803, 163 Cal.Rptr. 628 (1980); *Toney v. WCCO Television, Midwest Cable and Satellite, Inc.*, 85 F.3d 383 (8th Cir.1996); *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990).

Ms. Starke's attempt to demonize Mr. Blaylock for his private lifestyle implies that Mr. Blaylock is somehow evil or to be shunned by society.  *See*, *Hughes v. Hughes*, 122 Cal.App.4th 931 (2004) ("A statement may be a characterization of the person about whom it is made that expresses the maker's unfavorable judgment upon undisclosed conduct of the other.  If this unfavorable comment implies the existence of facts that justify the terms in which he has described the person of whom he spoke, it is the truth of these facts that is to be determined."); *Corey v. Pierce County*, 2010 WL 2455956 (Wash. Ct. App. Div. 1 2010) (defamation by implication occurs when "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts.'") *See also*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (defamation arises from a statement that "reasonably implies false and defamatory facts" where the plaintiff "shows that such statements were made with knowledge of their false implications or with reckless disregard of their truth."); *Heyward v. Credit Union Times*, 2012 WL 6632764 (D.N.M. 2012) ("'The theory of defamation by implication recognizes that the reputational injury caused by a communication may result not from what is said but from what is implied.'")

Ms. Starke's broadly stated falsehoods about being raped by my client, and her statements about my client's sex life, portrays my client in a negative fashion ascribing to him moral corruption and ill-repute.  It is well established that defamation may be accomplished through inference, innuendo or insinuation.  Somalia, Law of Defamation (2d Ed.) Vol. 1, §4:17 (2013).

Ms. Starke's fabricated narrative about Mr. Blaylock is unabashedly damaging to his character. Ms. Starke's fictional dialogue attributed to Mr. Blaylock establishes her malicious intent to cause Mr. Blaylock injury.  Ms. Starke's implied false facts about my client demonstrates her ill intent towards Mr. Blaylock.  Such an implication and interpretation further underscore the reputational harm your intended further publication of the Documentary is likely to cause Mr. Blaylock.

Also, if there is any statement, expressed or implied, or any suggestion or innuendo in the Proposed Documentary, or in any advertising or promotion for the Documentary, that the Documentary is authorized by Mr. Blaylock, or that he has endorsed the Proposed Documentary or that he has participated in any way in the production of the Documentary, or that he has agreed to the publication and distribution of the Documentary, this would constitute a blatant violation of the U.S. Lanham Act, including § 43(a) of the Act (15 U.S.C. Section 1125(a),) since any "false representation" or "false designation of origin" is prohibited.  The courts have determined that any "false attribution" of "authorship constitutes a violation of Section 43(a) if it misrepresents the



Evgeny Bolotin
November 20, 2023
Page 5

contribution of any person," (*Rosenfeld v. WP. Saunders*, 728 F.Supp 236, 243, (S.D.N.Y. 1990)). *See also*, *LaMothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1407 (9th Cir. 1988); *Gilliam v. American Broadcasting Co.*, 538 F.2d 14 (2nd Cir. 1976); *Smith v. Montoro*, 648 F.2d 602 (9th Cir. 1981).

This will also constitute notice that if you, or any of your employees, agents, or representatives, use any techniques in connection with your doing any interviews, investigation, or producing of the Proposed Documentary, which violate Mr. Blaylock's rights or anyone else's rights, through invasion of privacy, trespass, false representations, fraud, or deceit, you will be liable for any such tortious practices.  You are on notice that each of the photographs and text messages that you attached to your email were stolen by Ms. Starke from Mr. Blaylock, and therefore each are Mr. Blaylock's private property.  You are not authorized to use any such photos and/or text messages. Your failure to comply with this demand that no such photos, text messages, email messages that belong to Mr. Blaylock be further published, disseminated, and exploited by you will result in your being held liable for all legal remedies at Mr. Blaylock's disposal.

In addition, if any false representations or deceit are used to fraudulently induce third parties (including Mr. Blaylock's family members or friends) to provide otherwise confidential information, or to be deceived into cooperating in providing information under false pretenses then you, as well as your employees and/or agents are exposing yourselves to liability for intentional misrepresentation, fraud and deceit.  *See*, *for example*, *Veilleux v. NBC*, 8 F.2d 23 (D.Me. 1998); (court ruled that misrepresentations by the media to obtain information or induce cooperation was actionable).  *See also*, *Belluomo v. Kake TV & Radio, Inc.*, 3 Kan.App.2d 461, 596 P.2d 832 (1979); *Braun v. Flynt*, 726 F.2d 245 (5th Cir.1984) (the jury had found that defendant Hustler Magazine had misrepresented to the plaintiff the true nature of the magazine in obtaining plaintiff's consent regarding publication of a photo, and had falsely described and represented the magazine to be a "fashion magazine" with travel articles and having the same readership as Redbook or McCall's).

In sum, you are to immediately cease and desist in dissemination and publication of the false, fabricated, highly fictional, and defamatory Documentary by Ms. Starke.  You are to cease and desist in emailing, texting, private messaging anyone with this defamatory material.  Should you decide to ignore these demands, you will act at your own peril.  You will expose yourself to additional liability for intentionally spreading lies about my client despite having notice.  I trust that you will govern yourselves accordingly.

This letter does not constitute a complete or exhaustive statement of all my client's rights, claims, contentions, or legal theories.  Nothing stated herein is intended nor should it be deemed to constitute a waiver or relinquishment of any of my client's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.



Evgeny Bolotin
November 20, 2023
Page 6


This is a confidential legal notice and is not for publication.  Any publication, dissemination or broadcast of any portion of this letter will constitute a breach of confidence and a violation of the Copyright Act.  You are not authorized to publish this letter in whole or in part absent our express written authorization.

Very truly yours,

William J. Briggs, II


cc:     Keith Berglund
        Jessie Beeber, Esq.

# Exhibit F

REDACTED



**From:** Evgeny Bolotin
**Date:** Wednesday, November 22, 2023 at 9:50 AM
**To:** Dan Blaylock danbduke < bblaylock parkie frazier.blaylock@
**Subject:** #BANDAN

Good Morning:

It is with enormous pride that we will be aligning with the #metoo movement nationally and overseas and through the encouragement and suggestion of so many influential stakeholders in the #metoo movement that the below has gone from concept to one hundred % implementation:

\# BANDAN

Our mission will be to raise awareness, hold abusers accountable, and protect women from workplace violence and sexual exploitation.

Due to the incredible outpouring of love and devotion we have received from law enforcement and so many abused women we will be pleased to send you free of charge a #BANDAN T-SHIRT so you can proudly display your support and SOLIDARITY.

Below is the T Shirt

Following Christmas will offer:

#METOO

#BANDAN

Due to the outpouring of love and support we are rallying women against those in power who have abused women.

#BANDAN is more than a # hashtag it is a MOVEMENT so please join our movement of SOLIDARITY and we will add you to our Complimentary T Shirt List and also will sign you up to our #BANDAN NEWSLETTERS.

Each month we will expose those abusers of women whom prey on them through drugs, false promises, and of course VICTIM SHAMING.

WE STAND TOGETHER

WE STAND PROUD

AND WE STAND UNITED TO: # BAN DAN

[MeToo movement - Wikipedia](#)



**MeToo movement - Wikipedia**

#MeToo[a] is a social movement and awareness campaign against sexual abuse, sexual harassment, and rape culture,...

